UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 746 |
| v. | ) | Hon. Charles Norgle |
| | ) | |
| AUGUSTIN ZAMBRANO | ) | |

### GOVERNMENT'S POSITION PAPER ON SENTENCING

Augustin Zambrano was the absolute ruler and highest-ranking member of a murderous, violent criminal enterprise. He ran the Latin Kings, whose members counted 10,000 strong in Illinois alone. His reach extended to prison – where he ran the gang while serving a federal sentence for drug trafficking in the early 2000's.

Zambrano chose violence at every turn. The message he sent out through his words and actions was that violence was the only path that mattered. He did so personally and through his appointment of trusted lieutenants such as Fernando King and Vicente Garcia, who were responsible through their stewardship for murder, attempted murder, shootings, beatings, and other acts of violence. Zambrano did not carry out any of this violence by himself. He was insulated. He was behind the scenes. He entrusted others do it. He put leaders in place who shared his vision – like Fernando King and Vicente Garcia – to see to it that the Latin Kings acted barbarically. The result was an organization with its own rules, its own laws, and a savage code of violence. In many cases, the soldiers for whom defendant and the other leaders of the Latin Kings are responsible were simply boys who killed or were killed.

This investigation has sought to hold the leaders of the Latin Kings like Zambrano responsible for their iron-fisted leadership of a criminal enterprise responsible for multiple murders and attempted murders. As the CEO of this gang, Zambrano bears responsibility for its criminal acts. For all of those reasons, and for the reasons spelled out in this filing, the government requests that this Court impose a sentence of 60 years' imprisonment – the statutory maximum and below the Guideline range applicable in this case.

## I. BACKGROUND

Defendant went to trial in this case, and in his recent sentencing submission he sought at every turn to minimize the jury's verdict and the magnitude of the crimes he orchestrated as the leader of the Latin Kings. But the evidence at trial established beyond a reasonable doubt that defendant was a Corona of the Latin Kings. He led them. Defendant held the highest-ranking position within the Latin Kings. With that power came great responsibility. Ultimately, defendant is responsible for all of the criminal acts of his underlyings in this vast criminal enterprise.

Those criminal acts include:

- murders committed by his members on behalf of the Latin Kings – such as the murder of Oberia Pierce committed by Javier Ramirez's soldiers from the Spaulding and 23d Section in October 2007, and murders testified about by Milton Shanna;

- attempted murders committed by his members on behalf of the Latin Kings – such as the March 2, 2006 shooting of Alphonso Torres by Latin King Ernesto Grimaldo; the September 24, 2007 shootings of rival gang members ordered by Jose Guzman (who was eating dinner with defendant and Vicente Garcia when he gave the order); the November 20, 2007 shooting of a young girl by Latin Kings during a gunfight with a rival gang, as admitted by Fernando

Vazquez in a recorded conversation the next day; the November 25, 2007 shooting of an musician by Alphonso Chavez's soldiers; the January 21, 2008 shooting of Jaime Galvan by Latin Kings Danny Dominguez and Rudolfo Salazar; and all the shootings testified about by Milton Shanna, Ruben Caquias, and Nedal Issa.

- the beatings of miqueros who were being extorted by the Latin Kings, as testified about by Milton Shanna and as reported by miqueros who cooperated with the investigation.

- the beatings of Latin Kings who violated the gang's laws – such as the April 2008 beating of Rudolfo Salazar and another Latin King whose hands were smashed on defendant's orders; the May 2006 beating of a man in a bar who spilled a beer on defendant's wife; the March 2006 violation of Nedal Issa for his Section's failure to carry out an order to do a shooting; and the March 2006 violation of the Latin King soldier who failed to carry out the shooting.

Defendant is responsible for all of that violence. He put the officers and systems in place who made sure that violence would reign. In some cases, he ordered the violence himself. But regardless of whether defendant actually ordered an act of violence (or even knew that a particular shooting took place), all of it is reasonably foreseeable to him, as the leader of the Latin Kings. Because of all of that criminal conduct, defendant's total offense level is 43 – the highest level in the Guidelines. Indeed, defendant's properly calculated offense level is at least 50, but the Guidelines cap offense levels at 43. Defendant is also a Career Offender with convictions for among the worst, most serious crimes imaginable – a federal drug trafficking conviction; two attempted murder convictions; an unlawful use of weapon conviction; an aggravated assault conviction; and a burglary conviction.

One would have hoped that defendant would finally have turned his back on his profoundly serious life of crime when he left federal prison in late 2004 at the 44. Instead,

he commanded the Latin Kings from jail as best he could – even elevating Fernando King to the position of Supreme Regional Inca in late 2003 – and then seized the reins upon his release from prison. Defendant is a dangerous man. He should be sentenced accordingly.

## II.    GUIDELINES ISSUES

The Probation Department found that defendant had a total offense level of 50. Pursuant to Guideline Chapter 5, Part A, Application Note 2, an offense level of more than 43 is to be treated as an offense level of 43. Defendant's criminal history is category VI because he is a career offender. Accordingly, defendant's guideline range is life.

Defendant raises several "comments" about the jury's verdict and the charging decisions in this case which he claims are mitigating pursuant to §3553. The government will address those issues below. In terms of the Guidelines, defendant makes several conclusory arguments. First, he objects to the use of the murder and attempted murder guidelines. Second, he claims that the grouping rules were incorrectly calculated. Third, he argues that even though he was the Corona of the Latin Kings, he should not receive a leadership enhancement. Defendant's arguments are meritless.

### A.    *Murder and Attempted Murder*

The Probation Department found that defendant – a Latin King who from 2000 to 2009 was (and still is) the Corona of the Latin Kings – conspired or agreed to commit murder as necessary to promote the interests of the Latin Kings. The Probation Department also held defendant responsible for a murder and multiple attempted murders – all of which occurred during a time period when defendant was the highest-ranking member of the Latin Kings out

-4-

of custody. Tellingly, defendant does not contest the conspiracy to commit murder Guideline. He only asserts that he bears no responsibility for the murder or attempted murders attributed to him. According to defendant, because he did not order these specific shootings, he holds no responsibility for them. Defendant is mistaken.

Defendant's culpability is proven through the very structure of the Latin Kings that he oversaw. Defendant was at the very top. He was the Corona who led everyone else. As he acknowledges by his failure to object to it, he understood and agreed with his co-conspirators to commit murder as necessary to further the aims of the enterprise. Under the law, the question is simple – were these shootings reasonably foreseeable to defendant? Were they reasonably foreseeable events that would result from an agreement to commit murder? Of course they were. *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946) (a member of a conspiracy is criminally responsible for a substantive offense committed by his co-conspirators if he was a member of the conspiracy when the offense was committed, and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy). Because the testimony at trial showed how readily Latin Kings resorted to violence and their Rules mandated such behavior, those acts of violence were reasonably foreseeable to defendant. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003) (murder reasonably foreseeable to defendant "in light of the testimony showing that the conspirators in this case frequently resorted to violence to achieve their goals").

When defendant became a Latin King, defendant agreed to protect with his life the lives of his fellow Latin Kings. Moreover, the acts of violence and murder that the

government did establish were certainly foreseeable to defendant, and he is therefore accountable for them under the *Pinkerton* doctrine and through direct evidence.

The very first line of the Latin Kings' constitution speaks a bit to the agreement that Latin Kings have to commit murder (or be murdered) as necessary to further the interests of the enterprise:

> Every member of the Nation shall honor, respect and protect *with his life* the lives and reputation of all members of the Almighty Latin King Nation.

Latin Kings Constitution, attached hereto as Exhibit A, at p. 1. The plain meaning of that passage is clear – Latin Kings should be prepared to die (or kill) if necessary to protect fellow members. Witnesses have described that passage as part of their understanding that being a Latin King is potentially a life and death matter. Defendant claims that he did not author or ratify the Constitution or the rules, but the Constitution itself (which was drafted before defendant became Corona) states unequivocally that "Las Coronas are responsible for seeing that all officers abide by the Constitution and respect the rights of our membership."

The 26th Street Rules also speak to the agreement to commit murder as necessary to protect the neighborhood and further the interests of the Latin Kings. Those rules were authored by the defendant's hand-picked lieutenant – Fernando King, who defendant put in place in 2003 as the Supreme Regional Inca of the Latin Kings. A common thread running throughout those rules – a copy of which is attached hereto as Exhibit B – is that Latin Kings are permitted (and even required) to use violence when necessary.

Rule 9 states that "[n]o member in the Little Village is allowed to go to the opposition's side of town without proper security with him." Numerous cooperators testified that "security" means a gun and that "the opposition" means rival gangs.

Likewise, Rule 12 says, "No member in the Little Village Chapter is allowed to be in his hood without proper security." Again, numerous cooperators testified that "security" in this passage meant guns. As cooperators explained, Latin Kings are required to have guns at the ready and are taught that they should shoot to kill if they see rival gang members in their neighborhood. This is because Latin Kings are taught to protect their neighborhood from rival gang members: "All Chapters in the Little Village Region will hold their hood up to the up most, 'Protect your Hood' from anyone." (Rule 18).

Rule 13 proclaims that "[a]ll mandatory bust out that comes from this administration will be in forced [sic] from Thursday thru Sunday from 10:00 p.m. to 3:00 a.m." Several cooperators testified about "bust outs." Those were mandatory times each week when Latin King "soldiers" were required to stand on the block with guns at the ready in case a rival gang (or anyone suspicious) drove through the neighborhood. As cooperators made clear at trial, Latin Kings were ordered to shoot to kill. Thus, participation in mandatory bustouts necessarily meant an agreement to commit murder if necessary. Indeed, every night when a Latin King took a security shift on the block, that Latin King (and his Inca, Casique, and Enforcer responsible for insuring he was working security) was agreeing to commit murder if necessary to further the interests of the gang.

The leadership of the Latin Kings made clear that mandatory bustouts were a required duty. Indeed, as a cooperating witness testified at trial, Nation level officers patrolled the Region to make sure that each Section had people on the block during mandatory bust-outs with guns. *See* March 15 transcript at p. 18, attached hereto as Exhibit C. Defendant's hand-picked lieutenant Fernando King also had a police scanner in his apartment, which cooperating witnesses described was how the Latin Kings insured that soldiers carried out orders to do shootings. If the shootings did not occur, violations ensued. This was the system that defendant, through his trusted sidekick Fernando King, put in place. By doing so, he was insuring that violence would ensue.

Finally, Rule 24 stated plainly that "[a]ny member that is involved in the homicide of any innocent by -standards [sic], you will be put on hold pending an investigation." Tellingly, the same command is not in place for the killing of rival gang members.

Defendant's trial made clear that violence, shootings, and death were a day to day part of the Latin Kings experience. As each of the cooperators who testified at trial made clear, it was understood that the Latin Kings would turn to violence, shootings, and murder as necessary to protect themselves and their neighborhoods. Shoot to kill was the instruction – not shoot to injure. Milton Shanna, Ruben Caquias, Nedal Issa, and Ernesto Grimaldo all identified shootings that they either committed or ordered others to commit. All agreed that it was shoot to kill.

At trial, the government proved up over 20 shootings and at least 3 murders that resulted from Latin Kings violence. That is, unfortunately, a small sample of the violence

wrought by the Latin Kings in the Little Village area. Indeed, the Latin Kings had a "funeral fund" to pay for funerals of fallen Latin Kings. Each Section had to pay into the fund. It was part of their rules. Recordings played at trial discussed that funeral fund, as did cooperating witnesses.

The day to day violence of the Latin Kings in Little Village which was presented at trial is borne out by statistics. According to CPD crime records, between 2000 and 2007 in District 10 (which comprises part of the Little Village), there were 247 murders with firearm victims; 1,422 aggravated battery with firearm incidents; and 81 firearm discharge incidents. A copy of those statistics is attached hereto as Exhibit D. Of course, not all of those were committed by Latin Kings. But just by the breadth of the Latin Kings' control of Little Village, common sense tells us that hundreds and hundreds and hundreds of shootings resulted from Latin Kings conduct. Defendant was the highest ranking Latin King. He is responsible for the violence he oversaw.

As to the specific shootings attributed to defendant in the PSR, they all occurred during the time period defendant was the Corona of the Latin Kings. As Corona, Zambrano was ultimately responsible for the rules and Constitution – which also ordered Latin Kings to engage in shootings and also enforced rules that encouraged shootings to take place. For example, in approximately March 2006, Vicente Garcia was the Regional Enforcer for the 26th Street Region. He reported to Anthony Compean (Regional Inca), who reported to Fernando King (Supreme Regional Inca), who reported to defendant. Among other things, Garcia's responsibility included enforcing the rules of the Latin Kings. Garcia learned that

Latin Kings from two different Sections of the 26th Street Region – the Cicero Section and the Albany Section – had gotten into a fight. Garcia met with the Incas of the respective Sections and ordered the Cicero Section, whose Inca at the time was Nedal Issa, to conduct a shooting of a Latin Count as a punishment for the fight that the Cicero Latin King engaged in. The shooting did not occur quickly enough. Accordingly, at Garcia's order, Issa was violated by fellow Latin Kings. The Cicero Latin Kings were still responsible to do a shooting – as required by Garcia. On or about March 2, 2006, a Cicero Latin King shot and wounded a rival gang member. Both the victim and the shooter in that incident testified at trial.

In September 2007, defendant had appointed Garcia the Regional Officer for the 26th Street Region. Garcia at the time reported directly to Zambrano. One of the people who reported to Garcia was Regional Enforcer Jose Guzman. One of the Latin Kings rules that defendant enforced was a rule in the Constitution that declared that "Every member of the Nation shall honor, respect and protect with his life the lives and reputation of all members of the Almighty Latin King Nation." On or about September 19, 2007, Latin King Samuel Gutierrez was shot by a rival gang member. The Latin Kings retaliated. One of the standing orders that defendant's leadership insured was followed was that when a Latin King was shot, the five Sections closest to that Latin King's section were required to shoot a rival gang member.

On September 23, 2007, defendant was eating dinner with Jose Guzman, Vicente Garcia, and a cooperating witness. While they were at the house, Jose Guzman reminded the

five Sections of their responsibilities. The next day, one of the Sections retaliated by shooting a rival gang member in the area of 31st and Kedvale in Chicago. When arrested, Guzman admitted that at least two or three Sections had retaliated.

On October 29, 2007, co-defendant Javier Ramirez, an Inca within the 26th Street Region who reported to Garcia (and ultimately, defendant), met with the cooperating witness and discussed a shooting by his soldiers. Ramirez reported that "some of [his] guys" were involved in a shooting and "nigga got smoked, dawg." When the CW said that he thought two people died, Ramirez said that one person went to the hospital. Ramirez then told the CW that he had his little brother (who apparently did the shooting) "stashed . . . right by my house." Ramirez then said that his soldiers would not be able to do their normal "mandatory security" because of all the activity on the block. One of the shooting victims who survived the gunfire testified at trial and explained how he and his friend Oberia Pierce were fired upon. Pierce ultimately died.

On November 21, 2007, co-defendant Fernando Vazquez, an Inca within the 26th Street Region who reported to Garcia (and ultimately, defendant), met with the cooperating witness and Danny Dominguez. During that meeting, Vazquez described an exchange of gunfire that the Latin Kings had with the Deuces street gang the day before. Vazquez reported that "they were playing right there, some little girls, bro, and when she got shot in the back, bro." Vazquez then reported that the girl was "straight . . . but, you know, we gotta let these niggas know what's up, man."

-11-

A little over one week later, on November 30, 2007, Vazquez met with the cooperating witness and reported that his Section had retaliated against the Deuces. He said, "[A]s a matter of fact that same night I came to see you, uh, we went back out there to the block and them niggas came up, um, them deuces came out of the alley, bro, so we let loose . . . um, three times with the three shells we had, we let loose on them niggas, bro." Vazquez then reported that the police had come so his soldier had tossed the gun but a lady in the neighborhood pointed out to police where the gun was. Vazquez's answer was that "we gotta take care of that lady now." The cooperating witness talked Vazquez out of retaliation against the lady.

In November 2007, one of the Incas who reported to Garcia (and ultimately, defendant) was Alphonso Chavez, of the 31st and Drake Section. One of the rules enforced at the time and that was on a three page document that had been passed out to Incas such as Chavez in September 2007 stated, "No member are allowed to speed threw another Chapters hood or go down one ways the wrong way, if so you could be hurt or your car may be damage, we are not responsible for those things." On or about November 25, 2007, while Latin Kings from the 31st and Drake Section were performing "security" in the neighborhood by being visible on sidewalks in the neighborhood with ready access to guns, a vehicle drove the wrong way down Drake Street near 31st. In conformance with Latin King rules, one of the Latin Kings providing "security" at the time fired at the vehicle, striking a passenger in the vehicle, who required hospitalization. A few days later, Chavez reported the incident to one of the 26th Street Region Enforcers, who, unknown to the defendant, was cooperating

with the government. Chavez said that "dude came out speeding . . . well my guys were on their stuff, you know? Dude got hit." Chavez asked for permission to have his members off the streets for a few days and not provide security for a bit. Chavez received approval to do so.

On January 21, 2008, Latin King Milton Shanna was shot by a rival gang member. Latin Kings rules overseen and ultimately enforced by defendant required the Latin Kings to retaliate. On January 21, 2008, at approximately 8 p.m., a rival gang member and his girlfriend were walking down the street in the area of 38th and St. Louis. A vehicle rolled up, someone got out, said "King Love," and then the rival gang member was shot in the head and left forearm. He struggled with his attacker, and other men got out of the vehicle. They kicked the victim in the head, the face, and the body. In a conversation later that evening with a Latin King who unknown to them was cooperating with the FBI, Latin Kings Danny Dominguez and Rudolfo Salazar admitted to their participation in the shooting and described it as a "mandatory" shooting.

The government proved all of these shootings up at trial. In becoming a member of the Latin Kings, then becoming the Latin Kings' leader, defendant agreed with others to commit murder and support such actions by his conspirators. It is part of the Constitution and rules he agreed to follow, and it is part of the day-to-day activity that he presided over. Defendant was performing his part to further the aims of the enterprise – whose penchant for violence is unmistakable. Accordingly, as defendant has acknowledged by failing to object, the evidence establishes that part of the agreement to which defendant was a part was a

conspiracy to commit murder as necessary to further the aims of the enterprise.[1]  The particular shootings mentioned above (and likely many, many more) are attributable to defendant because he was accountable for them as the leader under whose watch the shootings occurred.  The Probation Department, then, got it right.

### B.     Grouping

Defendant next makes a somewhat academic argument concerning grouping of multiple activities when determining the appropriate offense level for a RICO conspiracy. Defendant cites *United States v. Altier*, 91 F.3d 953 (7th Cir. 1996), in support of his claim that the court should only apply one activity.  Defendant misreads *Altier* – which dealt with essentially one event, the arson of a car dealership.  *Altier* did not discuss grouping, or multiple criminal acts, or Section 2E1.1 of the Guidelines.  And, as defendant acknowledges, Application Note 1 to Guideline 2E1.1 supports the PSR's approach in this case.

For a conviction of 18 U.S.C. § 1962, the applicable guideline is § 2E1.1 (Unlawful Conduct Relating to Racketeering Influenced and Corrupt Organizations).  Guideline § 2E1.1(a)(2) states that the base offense level is the offense level applicable to the underlying racketeering activity.  Application Note 1 to Guideline § 2E1.1 states that where "there is

---

[1]The standard for making sentencing determinations is preponderance of the evidence.  *See, e.g., United States v. Smith*, 308 F.3d 726, 746 (7th Cir. 2002).  Defendant advocates for a clear and convincing evidence standard at sentencing on the basis of dicta in the Seventh Circuit decision in *United States v. Rodriguez*, 67 F.3d 1312 (7th Cir. 1995). But in *Rodriguez*, the Seventh Circuit approved the use of a preponderance of the evidence standard for a relevant conduct determination that extended a sentence from 51 -63 months to *life* in prison.  *See also United States v. Masters,* 978 F.2d 281, 283-85 (same for sentence increase from 33-41 months to 40 years).  The *Rodriguez* case, then, offers defendant no relief.

more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2)."

As indicated above, the underlying racketeering activity for the RICO conspiracy for which the defendant was convicted involved at least 1 murder, at least 7 attempted murders, a conspiracy to commit murder, extortion, aggravated assault, and other crimes. Thus, pursuant to the language of Application Note 1, each of these discrete acts of racketeering activity must be considered in determining the applicable base offense level for Count One. The Probation Department followed this process and therefore correctly calculated defendant's Guideline range.

### C.    *Role in the Offense*

The Probation Department also found that defendant merited a four level role in the offense adjustment as a leader/organizer of the criminal activity. Defendant argues summarily that "defendant was often times not informed or included in the decision making process." Defendant brief at 15.

Defendant was the acknowledged leader of the Latin Kings. He was the chief executive of an enterprise that numbered 10,000 people in Illinois alone. He clearly qualifies for the four level adjustment. The fact that he was not informed or included in every decision is not surprising. In fact, it would be surprising if the reverse were true. Defendant was the chief executive of a 10,000 member organization. He was in charge of the big picture – putting people into place to carry out the directives of the organization. He would not have been expected to know of every decision made by an individual Section member in terms of,

for instance, who was to work security on a particular night or whether to buy an additional gun for the Section.

## III. THE FACTORS SET FORTH IN 3553(a) JUSTIFY A GUIDELINE SENTENCE.

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

There are few federal crimes more serious than leadership of a violent, murderous, drug trafficking street gang. The nature of the offense, then, counsels in favor of a very significant sentence – as do his history and characteristics. Either through charisma or intimidation, defendant elevated to the highest ranks of the gang. At the age of 44, fresh from his release from a federal prison for drug trafficking, defendant continued his bloody leadership of the Latin Kings. He continues to be a very dangerous man.

Defendant's personal characteristics also dictate a very serious sentence. Defendant is an unrepentant gang leader. He is a Career Offender. His encounters with the criminal justice system date back to 1977, when he was 17 years old. He has been convicted of very, very serious crimes. In fact, defendant has six prior felony convictions – two for attempted murder, one for a federal drug trafficking crime, one for unlawful use of a weapon, one for aggravated assault, and one for burglary. As illustrated by defendant's criminal history, defendant's criminal conduct has persisted (and worsened). He was convicted in 1977 of unlawful use of a weapon and received 180 days in jail. He was convicted in 1979 of aggravated assault and sentenced to six months' probation. He was convicted in 1980 of attempted murder and sentenced to seven years' imprisonment. In that case, his car pulled

-16-

up to the victim, he pulled out a shotgun, and he shot the victim in the back and legs. In 1980, defendant was also convicted of burglary in a separate case. In 1988, he was convicted of attempted murder for shooting a man in the abdomen with a handgun. In 2000, when he was 40 years old, defendant was convicted of conspiracy to possess with intent to distribute cocaine and sentenced to 71 months' imprisonment. Defendant was then arrested for this conduct – involvement in a very serious RICO conspiracy. Defendant, through the variety of crimes he has committed, as well as his ongoing propensity to commit new crimes despite periods of imprisonment, has demonstrated a flat refusal to adhere his conduct to the laws of society.

In response, defendant claims that he kept the peace in the neighborhood, referencing a man named "Rascal" who was put on hold for rape. In fact, the talk about "Rascal" was that the "Old Man [defendant]'s out for Rascal a lot." G. Ex. 111, at p. 18. The conversation over the next few weeks about "Rascal" was that if he was seen in the neighborhood he would be dealt with.

Defendant also claims that at times he mediated conflicts. The government has no basis for knowing whether that is true. What is clear is that the defendant never ordered his troops to disarm. He never altered the Latin Kings' constitution or 26th Street Rules of engagement to have his soldiers stand down. He's never once captured on tape advocating peace or non-violence. Instead, in November 2007, when there was a threat to his leadership on the North Side of Chicago, he ordered soldiers to come to Humboldt Park as a show of

force. In April 2008, when his girlfriend claimed that two Latin Kings stole drugs from her, he set them up and then had their hands broken.

Defendant next says that he "worked with the group Cease Fire." Defendant Brief at 5. Defendant provides no support for that claim other than his self-serving comments.

Defendant then makes the entirely irrelevant claim that he is the oldest defendant in this case. He then seems to suggest that his recidivism will decline as he ages. Defendant is 51 years old. He was 40 when he committed his drug trafficking crime. He was 44 when he stepped out of prison and continued his participation in the Latin Kings. While it may be true statistically that recidivism rates decline with age, in defendant's case the opposite has occurred. His recidivism did not decline as his age increased. His criminal conduct persisted, and worsened. The only difference was that instead of actually committing acts of violence himself (such as the attempted murders for which he was convicted), defendant was at a high enough rank that he was comfortable with others doing so. Defendant's history – which is our only reliable guide – makes clear that defendant's actions do not fit the norm. He has continued to choose to engage in significant and ever more serious criminal conduct. He should be considered a dangerous man until the day he dies, because his background points in that direction and his leadership in the Latin Kings will continue. Thus, when considering the Section 3553 factors, the history and characteristics of the defendant are shaped more by his criminal association with the Latin Kings than by any other part of his background.

### B. *The Need for the Sentence Imposed*

The sentence imposed needs to be significant to reflect the seriousness of this crime, provide just punishment for it, and to deter defendant from committing other crimes. As discussed above, defendant's history makes clear that he has not been deterred by previous periods of incarceration. His conduct and his leadership of a criminal enterprise responsible for murder, attempted murder, extortion, and drug trafficking tears at the very fabric of our society. Defendant led a criminal enterprise which ravaged an entire community and victimized countless innocent people. There are real consequences to the violence perpetrated by the defendant and his criminal associates. Defendant's sentence should reflect that.

Indeed, no sentence is going to deter future criminal conduct by this defendant. As proved at trial, membership in the Latin Kings is for life. It is in their Constitution. Moreover, defendant's past makes clear that no sentence is going to deter this defendant or any member of the Latin Kings. Indeed, serving time in prison is a badge of honor in the Latin Kings. Defendant has had three significant stints in prison, and he has emerged after all of them committed to engaging in more crime.

A 60 year sentence will also act as general deterrence, sending a message to the young people throughout this judicial district that, if you join a gang, where murder, gun trafficking, and drug dealing are part of the agreement, you forfeit your right to live in a free society as soon as you are caught.

C.   *The Kinds of Sentence and the Sentencing Range established by the Guidelines*

The Guidelines provide a sound basis for arriving at an appropriate sentence in this case, particularly to insure that this defendant is sentenced on par with other defendants with similar records who have been found guilty of similar conduct.

In addition to all that has been proved about the Latin Kings with whom defendant associated, defendant himself engaged in a steady course of extortion, violence, and leadership of this deadly organization – which he bragged about on tape.  When considered with his awful criminal history, a reasonable sentence in this case is 60 years – which is below the applicable Guideline range.

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that this Court impose

a sentence of 60 years' imprisonment.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:     s/ Andrew C. Porter
ANDREW C. PORTER
NANCY DEPODESTA
TINOS DIAMANTATOS
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5358