UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 746 |
| v. | ) | Hon. Charles Norgle |
| | ) | |
| VICENTE GARCIA | ) | |

**GOVERNMENT'S POSITION PAPER ON SENTENCING**

For years, Vicente Garcia climbed through the ranks within a murderous, violent criminal enterprise likely because of his commitment to violence. At the time of his arrest, Garcia was the day to day leader of the Latin Kings, answerable only to one man. As many as 10,000 gang members reported to Garcia many of whom were simply boys sent off to kill or be killed by rules and policies overseen by Garcia. He maintained the savage, barbaric enterprise known as the Latin Kings and used his platform to oversee murder, attempted murder, shootings, beatings, drug trafficking, and other criminal activity. It is time to hold him accountable for his criminal acts.

This investigation has sought to hold the leaders of the Latin Kings like Garcia responsible for their iron-fisted leadership of a criminal enterprise responsible for multiple murders and attempted murders. As the Chief Operating Officer of this gang after his predecessor Fernando King went to jail, Garcia bears responsibility for its criminal acts. For all of those reasons, and for the reasons spelled out in this filing, the government requests that this Court impose a sentence of 60 years' imprisonment below the Guideline range applicable in this case.

## I. BACKGROUND

Defendant went to trial in this case, and in his sentencing submission he sought at every turn to minimize the jury's verdict and the magnitude of the crimes he orchestrated as the every day leader of the Latin Kings. But the evidence at trial established beyond a reasonable doubt that defendant was a high ranking member of the "Nation." In 2006, he was a Regional Enforcer. In 2007, he succeeded Anthony Compean (who had been arrested) as the Regional Inca of the 26th Street Region. By 2008, he had been elevated to the Supreme Regional Inca. In those positions, defendant had great power within the Latin Kings. He was, effectively, running the gang at Augustin Zambrano's behest. With that power came great responsibility. Ultimately, defendant is responsible for all of the criminal acts of his underlyings in this vast criminal enterprise.

Those criminal acts include:

- murders committed by his members on behalf of the Latin Kings such as the murder of Oberia Pierce committed by Javier Ramirez's soldiers from the Spaulding and 23d Section in October 2007, and murders testified about by Milton Shanna;

- attempted murders committed by his members on behalf of the Latin Kings such as the March 2, 2006 shooting of Alphonso Torres by Latin King Ernesto Grimaldo that defendant ordered; the September 24, 2007 shootings of rival gang members ordered by defendant's underlying, Jose Guzman (who was eating dinner with defendant when he gave the order); the November 20, 2007 shooting of a young girl by Latin Kings during a gunfight with a rival gang, as admitted by Fernando Vazquez in a recorded conversation the next day; the November 25, 2007 shooting of a musician by Alphonso Chavez's soldiers; the January 21, 2008 shooting of Jaime Galvan by Latin Kings Danny Dominguez and Rudolfo Salazar; and all the shootings testified about by Milton Shanna, Ruben Caquias, and Nedal Issa.

- the beatings of miqueros who were being extorted by the Latin Kings, as testified about by Milton Shanna and as reported by miqueros who cooperated with the investigation.

- the beatings of Latin Kings who violated the gang's laws such as the April 2008 beating of Rudolfo Salazar and another Latin King overseen by defendant and whose hands were smashed on Zambrano's orders; the March 2006 violation on defendant's orders of Nedal Issa for his Section's failure to carry out an order to do a shooting; and the March 2006 violation of the Latin King soldier who failed to carry out the shooting.

Defendant is responsible for all of that violence. He put the officers and systems in place who made sure that violence would reign. In some cases, he ordered the violence himself. But regardless of whether defendant actually ordered an act of violence (or even knew that a particular shooting took place), all of it is reasonably foreseeable to him, as the Chief Operating Officer of the Latin Kings. Because of all of that criminal conduct, defendant's total offense level is 43 the highest level in the Guidelines. Indeed, defendant's properly calculated offense level is at least 50, but the Guidelines cap offense levels at 43.

Defendant fled to Mexico and was a fugitive for several months. He was apprehended and returned to Chicago in late December 2008.

## II. GUIDELINES ISSUES

The Probation Department found that defendant had a total offense level of 50. Pursuant to Guideline Chapter 5, Part A, Application Note 2, an offense level of more than 43 is to be treated as an offense level of 43. Defendant's criminal history is category III because of multiple prior convictions. Accordingly, defendant's guideline range is life.

Defendant raises objections to almost every RICO act in the PSR but for RICO acts four and nine. The RICO acts to which defendant objects include conspiracy to commit murder, murder, and attempted murder. Defendant also objects to RICO acts involving aggravated assault and extortion. Defendant also objects to the gun enhancement, the leadership enhancement, and the crack cocaine findings. Defendant's arguments are meritless.

### *A. Conspiracy to commit murder (RICO Act One); Murder (RICO Act Two); and Attempted Murder (RICO Acts Three, Five, Six, Seven, and Eight).*

The Probation Department found that defendant   a Latin King who from 2006 to 2008 was the Regional Enforcer and then the Regional Inca of the Little Village Region and then became the Supreme Regional Inca of the Latin Kings   conspired or agreed to commit murder as necessary to promote the interests of the Latin Kings. The Probation Department also held defendant responsible for a murder and multiple attempted murders   all of which occurred during a time period when defendant was the highest-ranking member of the Latin Kings within the Little Village Region other than Augustin Zambrano. Tellingly, defendant does not contest one attempted murder   the March 2006 shooting by Ernesto Grimaldo that defendant ordered Nedel Issa's Cicero Section to commit. That March 2006 shooting was the basis for RICO Act Four. According to defendant, because he did not order many of these specific shootings, he holds no responsibility for them. Defendant is mistaken.

As to the conspiracy to commit murder (RICO Act One), defendant's culpability exists simply through his acknowledgment that the PSR appropriately holds him responsible for

RICO Act Four  the March 2006 shooting by Ernesto Grimaldo. On the basis of that shooting alone, defendant conspired to commit murder. He ordered Nedel Issa's Section to do a shooting. When the shooting was not done in a timely fashion, defendant ordered Issa violated (as defendant acknowledges through his failure to object to RICO Act Nine  the aggravated assault of Issa). But even after he had Issa beaten, defendant demanded that the shooting occur. As discussed later in this brief, the testimony at trial was that Latin Kings were to shoot to kill. Thus, through this order, defendant entered into an agreement with Issa and others in Issa's Section to commit murder  whether or not a shooting actually resulted in death.

Of course, much more evidence was presented in addition to the March 2006 shooting by Ernesto Grimaldo to establish defendant did conspire with others to commit murder and to hold him responsible for murder and attempted murder. Defendant's own words also prove his role within the Latin Kings and his thirst for violence.

On September 23, 2007, when he promoted Milton Shanna to Enforcer and when one of his other Enforcers (Jose Guzman) was ordering five Latin Kings to conduct shootings, Garcia discussed the Latin Kings' funeral fund and why he had people violated who were late in paying their Section's $100:

> And the only reason why we're strict, real strict on that, bro, is because you know what? It's not fucking cool, bro  when you're fucking, when a guy passes away, dog . . . you know, it's bad enough we can only give fucking $2,400.

G. Ex. 95 at 60. The next day, Garcia, Guzman, and the cooperating witness met with an Inca whose members he had ordered violated because they went to another Section. Defendant quoted the Little Village Rules: " . . . in the Little Village Laws . . . it . . . says, you know . . . no more than three pe-, two people suppose to go to somebody else's hood." G. Ex. 97 at 9; *see also* Little Village Rules, Rule 5 ("No Chapter is allowed to go to another Chapter with more than two individuals to discuss any business."). Defendant then discussed the violation that he was ordering: "Well he's gonna get piped for that." G. Ex. 97 at 11. Defendant continued, ". . . as for now, two guys are getting piped over there . . . " *Id.* at 12. He added, "Regardless of who, who it is, two of his niggas are getting piped up." *Id.* at 26.

On October 5, 2007, defendant, Guzman, and the cooperating witness met to discuss various Latin Kings business. One of the items of business raised by Guzman was a 22 gang member named "Renee." Guzman said, " . . . a lot of the brothers have been complaining . . . about uh, about Renee." G. Ex. 111 at 23. Defendant had a quick resolution: "Well, smoke him," meaning, kill him. *Id.*

Defendant's culpability is also proven through the very structure of the Latin Kings that he oversaw. Along with Zambrano, defendant was at the very top. He was the Chief Operating Officer in charge of Little Village who led everyone else. He understood and agreed with his co-conspirators to commit murder as necessary to further the aims of the enterprise. Under the law, the question is simple were these shootings reasonably foreseeable to defendant? Were they reasonably foreseeable events that would result from

an agreement to commit murder? Of course they were. *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946) (a member of a conspiracy is criminally responsible for a substantive offense committed by his co-conspirators if he was a member of the conspiracy when the offense was committed, and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy). Because the testimony at trial showed how readily Latin Kings including defendant resorted to violence and their Rules (copies of which defendant had sent out to all Incas) mandated such behavior, those acts of violence were reasonably foreseeable to defendant. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003) (murder reasonably foreseeable to defendant "in light of the testimony showing that the conspirators in this case frequently resorted to violence to achieve their goals").

The foreseeability of murder began the moment defendant joined the gang. When defendant became a Latin King, defendant agreed to protect with his life the lives of his fellow Latin Kings. Moreover, the acts of violence and murder that the government did establish were certainly foreseeable to defendant, and he is therefore accountable for them under the *Pinkerton* doctrine and through direct evidence.

The very first line of the Latin Kings' constitution speaks a bit to the agreement that Latin Kings have to commit murder (or be murdered) as necessary to further the interests of the enterprise:

> Every member of the Nation shall honor, respect and protect *with his life* the lives and reputation of all members of the Almighty Latin King Nation.

Latin Kings Constitution, attached hereto as Exhibit A, at p. 1. The plain meaning of that passage is clear Latin Kings should be prepared to die (or kill) if necessary to protect fellow members. Witnesses have described that passage as part of their understanding that being a Latin King is potentially a life and death matter.

The 26th Street Rules also speak to the agreement to commit murder as necessary to protect the neighborhood and further the interests of the Latin Kings. Those rules were emphasized by defendant throughout his tenure as Regional Inca of the Little Village. In August and September 2007, he had copies passed out to Incas. A common thread running throughout those rules a copy of which is attached hereto as Exhibit B is that Latin Kings are permitted (and even required) to use violence when necessary.

Rule 9 states that "[n]o member in the Little Village is allowed to go to the opposition's side of town without proper security with him." Numerous cooperators testified that "security" means a gun and that "the opposition" means rival gangs.

Likewise, Rule 12 says, "No member in the Little Village Chapter is allowed to be in his hood without proper security." Again, numerous cooperators testified that "security" in this passage meant guns. As cooperators explained, Latin Kings are required to have guns at the ready and are taught that they should shoot to kill if they see rival gang members in their neighborhood. This is because Latin Kings are taught to protect their neighborhood from rival gang members: "All Chapters in the Little Village Region will hold their hood up to the up most, 'Protect your Hood' from anyone." (Rule 18).

Rule 13 proclaims that "[a]ll mandatory bust out that comes from this administration will be in forced [sic] from Thursday thru Sunday from 10:00 p.m. to 3:00 a.m." Several cooperators testified about "bust outs." Those were mandatory times each week when Latin King "soldiers" were required to stand on the block with guns at the ready in case a rival gang (or anyone suspicious) drove through the neighborhood. As cooperators made clear at trial, Latin Kings were ordered to shoot to kill. Thus, participation in mandatory bustouts necessarily meant an agreement to commit murder if necessary. Indeed, every night when a Latin King took a security shift on the block, that Latin King (and his Inca, Casique, and Enforcer responsible for insuring he was working security) was agreeing to commit murder if necessary to further the interests of the gang.

Defendant made clear that mandatory bustouts were a required duty. Indeed, as a cooperating witness testified at trial, Nation level officers Enforcers patrolled the Region to make sure that each Section had people on the block during mandatory bust-outs with guns. *See* March 15 transcript at p. 1645-1646, attached hereto as Exhibit C. Defendant held that Enforcer position and also oversaw others, like cooperating witness Milton Shanna, who acted as Enforcers and undertook that responsibility. There was also testimony about Latin Kings' leadership's use of police scanners in order to insure that soldiers carried out orders to do shootings. If the shootings did not occur, violations ensued. This was the system that defendant carried out from predecessors such as Fernando King, who had a police scanner in his apartment when he was arrested.

Finally, Rule 24 stated plainly that "[a]ny member that is involved in the homicide of any innocent by -standards [sic], you will be put on hold pending an investigation." Tellingly, the same command is not in place for the killing of rival gang members. This Rule makes deadly clear that the Latin Kings were about violence and murder, and defendant does not even begin to attempt to provide a benign meaning for Rule 24 in his filing.

Defendant's trial made clear that violence, shootings, and death were a day to day part of the Latin Kings experience. As each of the cooperators who testified at trial made clear, it was understood that the Latin Kings would turn to violence, shootings, and murder as necessary to protect themselves and their neighborhoods. Shoot to kill was the instruction not shoot to injure. Milton Shanna, Ruben Caquias, Nedal Issa, and Ernesto Grimaldo all identified shootings that they either committed or ordered others to commit. All agreed that it was shoot to kill.

At trial, the government proved up over 20 shootings and at least 3 murders that resulted from Latin Kings violence. That is, unfortunately, a small sample of the violence wrought by the Latin Kings in the Little Village area. Indeed, the Latin Kings had a "funeral fund" to pay for funerals of fallen Latin Kings. Each Section had to pay into the fund. It was part of their rules. Recordings played at trial discussed that funeral fund, as did cooperating witnesses.

The day to day violence of the Latin Kings in Little Village which was presented at trial is borne out by statistics. According to CPD crime records, between 2000 and 2007 in

District 10 (which comprises part of the Little Village), there were 247 murders with firearm victims; 1,422 aggravated battery with firearm incidents; and 81 firearm discharge incidents. A copy of those statistics is attached hereto as Exhibit D. Of course, not all of those were committed by Latin Kings. But just by the breadth of the Latin Kings' control of Little Village, common sense tells us that hundreds and hundreds and hundreds of shootings resulted from Latin Kings conduct. Defendant was the highest ranking Latin King. He is responsible for the violence he oversaw.

As to the specific shootings attributed to defendant in the PSR, they all occurred during the time period defendant was either the Regional Inca of the Little Village Region or the Supreme Regional Inca of the Latin Kings. In those positions, defendant (working at the behest of Augustin Zambrano) was ultimately responsible for the enforcement of the gang's rules and Constitution.

For example, in approximately March 2006, defendant was the Regional Enforcer for the 26th Street Region. He reported to Anthony Compean (Regional Inca), who reported to Fernando King (Supreme Regional Inca), who reported to Zambrano. Among other things, defendant's responsibility included enforcing the rules of the Latin Kings. Defendant learned that Latin Kings from two different Sections of the 26th Street Region   the Cicero Section and the Albany Section   had gotten into a fight. Defendant met with the Incas of the respective Sections and ordered the Cicero Section, whose Inca at the time was Nedal Issa, to conduct a shooting of a Latin Count as a punishment for the fight that the Cicero Latin

King engaged in. The shooting did not occur quickly enough. Accordingly, at defendant's order, Issa was violated by fellow Latin Kings. The Cicero Latin Kings were still responsible to do a shooting as required by defendant. On or about March 2, 2006, a Cicero Latin King named Ernesto Grimaldo shot and wounded a rival gang member. Both the victim and the shooter in that incident testified at trial.

By September 2007, defendant was the Regional Officer for the 26th Street Region. One of the people who reported to defendant was Regional Enforcer Jose Guzman. One of the Latin Kings rules that defendant enforced was a rule in the Constitution that declared that "Every member of the Nation shall honor, respect and protect with his life the lives and reputation of all members of the Almighty Latin King Nation." On or about September 19, 2007, Latin King Samuel Gutierrez was shot by a rival gang member. The Latin Kings retaliated. One of the standing orders that defendant's leadership insured was followed was that when a Latin King was shot, the five Sections closest to that Latin King's section were required to shoot a rival gang member.

On September 23, 2007, defendant was eating dinner with Jose Guzman, Augustin Zambrano, and a cooperating witness. While they were at the house, Jose Guzman reminded the five Sections of their responsibilities. The next day, one of the Sections retaliated by shooting a rival gang member in the area of 31st and Kedvale in Chicago. When arrested, Guzman admitted that at least two or three Sections had retaliated.

On October 29, 2007, co-defendant Javier Ramirez, an Inca within the 26th Street Region who reported to defendant, met with the cooperating witness and discussed a shooting by his soldiers. Ramirez reported that "some of [his] guys" were involved in a shooting and "nigga got smoked, dawg." When the CW said that he thought two people died, Ramirez said that one person went to the hospital. Ramirez then told the CW that he had his little brother (who apparently did the shooting) "stashed . . . right by my house." Ramirez then said that his soldiers would not be able to do their normal "mandatory security" because of all the activity on the block. One of the shooting victims who survived the gunfire testified at trial and explained how he and his friend Oberia Pierce were fired upon. Pierce ultimately died.

On November 21, 2007, co-defendant Fernando Vazquez, an Inca within the 26th Street Region who reported to defendant, met with the cooperating witness and Danny Dominguez. During that meeting, Vazquez described an exchange of gunfire that the Latin Kings had with the Deuces street gang the day before. Vazquez reported that "they were playing right there, some little girls, bro, and when she got shot in the back, bro." Vazquez then reported that the girl was "straight . . . but, you know, we gotta let these niggas know what's up, man."

A little over one week later, on November 30, 2007, Vazquez met with the cooperating witness and reported that his Section had retaliated against the Deuces. He said, "[A]s a matter of fact that same night I came to see you, uh, we went back out there to the

block and them niggas came up, um, them deuces came out of the alley, bro, so we let loose . . . um, three times with the three shells we had, we let loose on them niggas, bro." Vazquez then reported that the police had come so his soldier had tossed the gang's gun but a lady in the neighborhood pointed out to police where the gun was. Vazquez's answer was that "we gotta take care of that lady now." The cooperating witness talked Vazquez out of retaliation against the lady.

In November 2007, another of the Incas who reported to defendant was Alphonso Chavez, of the 31st and Drake Section. One of the rules enforced at the time and that was on a three page document that had been passed out (at defendant's behest) to Incas such as Chavez in September 2007 stated, "No member are allowed to speed threw another Chapters hood or go down one ways the wrong way, if so you could be hurt or your car may be damage, we are not responsible for those things." On or about November 25, 2007, while Latin Kings from the 31st and Drake Section were performing "security" in the neighborhood by being visible on sidewalks in the neighborhood with ready access to guns, a vehicle drove the wrong way down Drake Street near 31st. In conformance with Latin King rules, one of the Latin Kings providing "security" at the time fired at the vehicle, striking a passenger in the vehicle, who required hospitalization. A few days later, Chavez reported the incident to one of the 26th Street Region Enforcers, who, unknown to the defendant, was cooperating with the government. Chavez said that "dude came out speeding . . . well my guys were on their stuff, you know? Dude got hit." Chavez asked for permission to have his members off

the streets for a few days and not provide security for a bit. Chavez received approval to do so.

On January 21, 2008, Latin King Milton Shanna was shot by a rival gang member. Latin Kings rules overseen and enforced by defendant required the Latin Kings to retaliate. On January 21, 2008, at approximately 8 p.m., a rival gang member and his girlfriend were walking down the street in the area of 38th and St. Louis. A vehicle rolled up, someone got out, said "King Love," and then the rival gang member was shot in the head and left forearm. He struggled with his attacker, and other men got out of the vehicle. They kicked the victim in the head, the face, and the body. In a conversation later that evening with a Latin King who unknown to them was cooperating with the FBI, Latin Kings Danny Dominguez and Rudolfo Salazar admitted to their participation in the shooting and described it as a "mandatory" shooting.

The government proved all of these shootings up at trial. In becoming a member of the Latin Kings, then becoming a leader of the Latin Kings, defendant agreed with others to commit murder and support such actions by his conspirators. It is part of the Constitution and rules he agreed to follow, and it is part of the day-to-day activity that he presided over. Defendant was performing his part to further the aims of the enterprise whose penchant for violence is unmistakable. The particular shootings mentioned above (and likely many, many more) are attributable to defendant because he was accountable for them as a leader under whose watch the shootings occurred. The Probation Department, then, got it right.

### *B. RICO Act Ten and Count Ten (Extortion)*

Defendant next objects to being held responsible for extortion of the miqueros. He asserts that the government "failed to prove that the street tax was paid to avoid physical retaliation by the Latin Kings." Br. at 10. Defendant made a similar objection in his motion for new trial. As the government argued in its response to defendant's motion for new trial, evidence was presented at trial that established that the miqueros paid a street tax to avoid violence by the Latin Kings.

In terms of the threat of violence, Milton Shanna, Ruben Caquias, and (to a much lesser extent) Jesse Guajardo testified about the threat of violence. As just one example, Milton Shanna testified squarely about the relationship between the miqueros and the Latin Kings. Shanna testified that from 1997 through April 2007 and beyond (Tr. 1648, 1651, 1960 - 1988), the miqueros sold documents in the 26th Street Region. Shanna told about one occasion where he and others committed a home invasion of a miquero on the orders of a Nation officer (Tr. 1649).[1] Shanna also explained what happened if the miqueros did not pay their monthly street tax:

> If they didn't pay then we were sent out to go and like I said, for instance, they didn't pay that time so we were sent to that house where they believed that they had the machines and whatnot, and we we beat them up. Beat them up, and they weren't allowed to operate until they paid.

---

[1]Defendant points out that the home invasion against the miquero occurred in 1998. However, Shanna testified repeatedly that his understanding of the relationship between the miqueros and the Latin Kings spanned from 1997 through 2007. Tr. 1648, 1651, 1960-1988.

Tr. 1650. Shanna described another experience where he and fellow Latin Kings were sent out by Nation level officers to the "Discount Mall" to beat up miqueros: "So when we got there, we jumped out like we were going to buy Ids from them, and we just beat the heck out of them." Tr. 1650. When asked why he was ordered to go to the Discount Mall, Shanna answered, "Because they weren't paying their dues that they were supposed to be paying." Tr. 1651. Caquias testified similarly. Tr. 2546 ("They [meaning Latin Kings] would get money from extortion for protection . . . "). In one instance, Caquias testified that Garcia directed him to go out to talk with the miqueros about an issue they had. In another instance, Garcia was caught on tape discussing the miqueros business. Finally, Shanna recorded a conversation with co-conspirator Felipe Zamora about collecting money from the miqueros in which Garcia was mentioned repeatedly. Thus, the government provided sufficient evidence from which a reasonable juror could conclude that the miqueros paid the monthly street tax not because they wanted to but because they feared getting beaten and further that Garcia was involved in a conspiracy to extort the miqueros.

Thus, the PSR properly held defendant responsible for the extortion of the miqueros.

**C. *RICO Act Eleven and Count Nine (aggravated assault on April 14, 2008)***

Defendant next repeats an argument he made in his post-trial motion that the assault on Mr. Salazar was not an offense committed in furtherance of the charged RICO. The government adopts its response to the defendant's post-trial motion. Simply put, the assault was part of the charged RICO because it was ordered by Latin Kings, committed by Latin

Kings, and performed to enforce discipline within the ranks. Accordingly, the PSR appropriately held defendant responsible for this act.

**D. *Gun enhancement***

The PSR concluded that a dangerous weapon was possessed in furtherance of the drug trafficking offense:

> like all sections of the 26th Street Region of the Latin Kings, the defendant's Section possessed firearms in connection with the instant conspiracy. Defendant Garcia was aware that Latin Kings had guns at their disposal to protect themselves and their neighborhoods, and to physically harm or kill rival gang members. Further, the defendant knew that the money made through the 26th Street Region of the Latin Kings drug sales was used for, among other purposes, the purchase of additional firearms for the gang members to protect themselves. In fact, the defendant ordered subordinate Latin Kings to engage in shootings as necessary.

PSR at 28.

The PSR got it right. Each Section of the Latin Kings had weapons at their disposal to protect themselves and their narcotics. Moreover, one of the goals of the drug trafficking campaign was to purchase additional weapons. The two level enhancement was therefore appropriate.

**E. *Due Process Claim***

Defendant next argues that sentencing him for murders and attempted murders upon which the jury did not render judgment would violate the Due Process Clause. Defendant offers no caselaw in support of his novel argument. He also misapprehends the relevance of the murder, attempted murder, and conspiracy to commit murder evidence that is relevant to his sentencing.

Defendant suggests that the government here indicted and convicted him of a "relatively minor offense" and then waited "until sentencing to seek considerably higher sentences for more serious accusations that could not be proven beyond a reasonable doubt." Br. at 12. That is not what happened here. The jury heard all about the violence, shootings, murders, and attempted murders engaged in by the Latin Kings. Defendant was one of a handful of people who ran that murderous, violent enterprise. That is what he was charged with  RICO, aggravated assault, aggravated assault with a weapon, use of a firearm in furtherance of a crime of violence, extortion, and drug trafficking. Those are not "relatively minor offenses." And because the RICO charge of which defendant stands convicted included acts of murder and attempted murder, those acts will properly be raised at defendant's sentencing.

**F. *Role in the Offense***

The Probation Department also found that defendant merited a four level role in the offense adjustment as a leader/organizer of the criminal activity. Defendant argues summarily that he did not play any role in many of the RICO Acts attributable to him and therefore a role in the offense adjustment is improper. Again, defendant attempts to cabin his involvement in these crimes too narrowly.

Defendant was the acknowledged leader of the 26th Street Region Latin Kings. He was the chief operating officer of an enterprise that numbered 10,000 people in Illinois alone. He clearly qualifies for the four level adjustment. The fact that he was not informed or

included in every decision is not surprising. In fact, it would be surprising if the reverse were true. Defendant was the chief operating officer of a 10,000 member organization. He was in charge of the big picture putting people into place to carry out the directives of the organization. He would not have been expected to know of every decision made by an individual Section member in terms of, for instance, who was to work security on a particular night or whether to buy an additional gun for the Section.

**G. *Criminal history***

Defendant next argues that all of his convictions were part of the instant RICO offense. Defendant is mistaken. Even assuming that each sentence about which defendant complains resulted from relevant conduct, the sentences would still have been appropriately counted in the criminal history computation. *See United States v. Morales,* F.3d ----, 2011 WL 3625135 (7th Cir. 2011) (affirming award of criminal history points in RICO case for convictions assumed to be relevant conduct). As the Court in *Morales* said, "The guidelines recognize that a defendant may be convicted of racketeering based in part on conduct for which he has already been convicted and sentenced. *See* U.S.S.G. § 2E1.1 cmt. n.4." Under the Guidelines, if "the previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense" the previously imposed sentence is treated "as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense." *Id.* "In other words, RICO presents an exception to the general rule of § 4A1.2(a)(1.)" *United States v. Garecht*,

183 F.3d 671, 677 (7th Cir.1999). Therefore, the PSR accurately reflected defendant's criminal history as Category III.

## III. 3553(a) FACTORS JUSTIFY A VERY SIGNIFICANT SENTENCE.

### *A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant*

There are few federal crimes more serious than leadership of a violent, murderous, drug trafficking street gang. Defendant elevated to the highest ranks within one of the largest street gangs in the country. The nature of the offense, then, counsels in favor of a very significant sentence.

Defendant's encounters with the criminal justice system date back to 1994, when he was convicted of battery. As illustrated by defendant's criminal history, defendant's criminal conduct persisted (and worsened). In 1995, he was convicted of criminal damage to property. In 1997, he was convicted of aggravated battery in a public place. Throughout the first decade of 2000, defendant rose through the ranks of the Latin Kings. When he was 31 years old, he was arrested for this conduct involvement in and leadership of a very serious racketeering enterprise. Defendant, through the variety of crimes he has committed, has demonstrated an unwillingness to adhere his conduct to the laws of society.

In response, defendant points to his work history at UPS and blames his conduct on his cousin who led him into the gang. He even goes so far to claim baselessly that "[h]e wanted to leave the Latin Kings." Br. at 21. No evidence for that exists in the trial record. It is a self-serving attempt to distance himself from the barbaric acts of the gang he led with

such pride. There has never been a reason for defendant to continue on his destructive path because of his employment prospects and loving family. But he has persisted. What is clear is that like his boss, Augustin Zambrano the defendant never ordered his troops to disarm. He never altered the 26th Street Rules of engagement to have his soldiers stand down. He's never once captured on tape advocating peace or non-violence. Instead, his creed can be boiled down to the simple edict he was captured on tape uttering: "Well smoke him." Thus, when considering the Section 3553 factors, the history and characteristics of the defendant are shaped more by his criminal association with the Latin Kings than by any other part of his background.

**B.** ***The Need for the Sentence Imposed***

The sentence imposed needs to be significant to reflect the seriousness of this crime, provide just punishment for it, and to deter defendant from committing other crimes. His conduct and his leadership of a criminal enterprise responsible for murder, attempted murder, extortion, and drug trafficking tears at the very fabric of our society. Defendant led a criminal enterprise which ravaged an entire community and victimized countless innocent people. There are real consequences to the violence perpetrated by the defendant and his criminal associates. Defendant's sentence should reflect that.

Indeed, no sentence is going to deter future criminal conduct by this defendant. As proved at trial, membership in the Latin Kings is for life. It is in their Constitution. Moreover, defendant's past makes clear that no sentence is going to deter this defendant or

any member of the Latin Kings. Indeed, serving time in prison is a badge of honor in the Latin Kings.

A 60 year sentence will also act as general deterrence, sending a message to the young people throughout this judicial district that, if you join a gang, where murder, gun trafficking, and drug dealing are part of the agreement, you forfeit your right to live in a free society as soon as you are caught.

### C. *The Kinds of Sentence and the Sentencing Range established by the Guidelines*

The Guidelines provide a sound basis for arriving at an appropriate sentence in this case, particularly to insure that this defendant is sentenced on par with other defendants with similar records who have been found guilty of similar conduct.

In addition to all that has been proved about the Latin Kings with whom defendant associated, defendant himself engaged in a steady course of extortion, violence, and leadership of this deadly organization which he bragged about on tape. Therefore, a reasonable sentence in this case is 60 years which is below the applicable Guideline range.

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose a sentence of 60 years' imprisonment.

Respectfully submitted,

GARY S. SHAPIRO
United States Attorney

By: /s/ Andrew C. Porter
ANDREW C. PORTER
NANCY DEPODESTA
TINOS DIAMANTATOS
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5358

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

**GOVERNMENT'S POSITION PAPER ON SENTENCING**

was served pursuant to the district court's ECF system as to ECF filers on JANUARY 31, 2013.

/s/ Andrew C. Porter
ANDREW C. PORTER
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5358